Joseph Serino, Jr., P.C.
David S. Flugman
Dmitriy G. Tishyevich (*pro hac vice* application to be filed)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
joseph.serino@kirkland.com
david.flugman@kirkland.com
dmitriy.tishyevich@kirkland.com

*Attorneys for Plaintiff Restorsea, LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RESTORSEA, LLC, | CASE NO. _____ |
| Plaintiff, | ECF Case |
| - against - | |
| AQUA BIO TECHNOLOGY ASA, | |
| Defendant. | |

**COMPLAINT**

Plaintiff Restorsea, LLC ("Restorsea"), by and through its attorneys, Kirkland & Ellis

LLP, alleges the following in support of its Complaint against Defendant Aqua Bio Technology

ASA ("ABT"):

**NATURE OF THE ACTION**

1.      This is a breach of contract case involving irreplaceable exclusivity rights and

millions of dollars in damages.  In a 2012 Exclusivity Agreement, ABT, in exchange for millions

of dollars in consideration, promised to provide Restorsea with exclusive worldwide rights to

salmon hatching fluid from hatcheries in Norway that Restorsea was using in a newly-developed

line of skincare products.  But ABT has failed to honor its binding commitments to Restorsea by, among other things, supplying prohibited products to Restorsea competitors and others in the cosmetics industry in violation of the exclusivity provision.  Restorsea now brings this action to: (a) compel ABT's specific performance of its exclusivity promises under the parties' contract, and (b) recover damages for the monetary harm already suffered by Restorsea as a result of ABT's broken promises.

2.    Restorsea is a prestige skin care company that burst onto the U.S. skincare market in 2012 with a revolutionary line of anti-aging products.  Although Restorsea's products have been sold in the retail market for only a little more than a year, beauty and mainstream media outlets alike—including Elle Magazine, the New York Times, Lucky, Marie Claire, Harper's Bazaar, InStyle, DuJour, WhoWhatWear, and Style.com—have showered accolades on Restorsea's creams for their efficacy in revitalizing skin.  Beauty Snob named Restorsea's products the "Best New Beauty Launch of 2012," The Blush praised them as one of the "Best Beauty Inventions of 2012," Travel + Leisure named them among the best moisturizers, and in 2013 Harper's Bazaar named them among "The Best New Anti-Wrinkle Creams."

3.    One secret to Restorsea's success has been its ability to unlock the restorative qualities of Aquabeautine XL, a product containing (among other things) an enzyme extracted from the hatching fluid of newborn salmon.  Unlike other exfoliating products which digest both dead and living cells when applied to the skin, the hatching fluid enzyme digests only the dead cells before shutting itself off.

4.    Restorsea buys Aquabeautine XL from ABT, a Norwegian company.  Restorsea's commercial relationship with ABT began after Restorsea's CEO, Patricia Pao, was touring Norway's largest salmon hatchery and noticed that the workers' hands, which were submerged in

the hatchery's waters all day, appeared more youthful than their aged faces.  This piqued Ms. Pao's interest in the potential anti-aging capabilities of the enzyme found in those hatchery waters.

5.      Ms. Pao learned that ABT was a commercial supplier of that enzyme.  Having spent her career in the cosmetics industry, Ms. Pao recognized the enzyme's potential use for cosmetic products, and Restorsea entered into negotiations with ABT to obtain a supply of and the right to use Aquabeautine XL.  After significant development work, Restorsea was able to develop cosmetic products that use the enzyme as an ingredient.

6.      Restorsea and ABT have two separate agreements: a Supply and License Agreement, pursuant to which ABT sells Aquabeautine XL to Restorsea, and an Exclusivity Agreement, under which ABT promises to provide Aquabeautine XL and certain similar products only to Restorsea.  This case is about the Exclusivity Agreement only.

7.      More specifically, this case is about the more than $5.9 million Restorsea has paid ABT to date for supposedly exclusive rights to Aquabeautine XL and other similar products, while ABT, in violation of the parties' Exclusivity Agreement, has been marketing and selling prohibited products to various third parties, including Restorsea's competitors.

8.      After Restorsea's efforts to bring these breaches to ABT's attention fell on deaf ears, Restorsea commenced this action in order to hold ABT to its promises under the Exclusivity Agreement and to recover the millions of dollars in damages it has suffered as a result of ABT's breaches to date.

## PARTIES

9.     Plaintiff Restorsea, LLC is a manufacturer and seller of skincare products. Restorsea is a Delaware limited liability company with its principal place of business in New York, New York.

10.     Defendant Aqua Bio Technology ASA is a developer and seller of ingredients for the dermatology and skin care industry.  On information and belief, Aqua Bio Technology ASA is a Norwegian public limited liability company with its principal place of business in Bergen, Norway.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  This is a civil action between citizens of a state and citizens of a foreign state, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

12.     This Court has personal jurisdiction over ABT because ABT has transacted business within New York and there is a substantial relationship between those acts and Restorsea's claims, and because ABT has otherwise made and established contacts with New York sufficient to permit the exercise of personal jurisdiction over it.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Restorsea's claims occurred in this district.

## FACTUAL BACKGROUND

### A.     Restorsea Develops a Successful Line of Skincare Products, an Important Ingredient of Which Is ABT's Aquabeautine XL

14.     Patricia Pao is the driving force behind Restorsea.  A graduate of the University of California, Berkeley and Harvard Business School, Ms. Pao was well known in the beauty industry long before she started Restorsea.  She has been developing new technologies in

4

cosmetics for twenty-five years, and has launched over 400 products for well-known brands including Avon, Elizabeth Arden, Guerlain, and Peter Thomas Roth.

15.    In 2010, while on a business trip to Norway, Ms. Pao toured a salmon hatchery. She noticed that the workers' hands, which are submerged in hatching water all day, appeared more youthful than their faces.

16.    As it turned out, the explanation for this phenomenon was in the hatching water itself. At birth, newly-spawned salmon release a unique enzyme that dissolves the shell of their egg and allows them to break out of it. That enzyme has two components: a protein and an exfoliant. The protein attaches itself to dead skin cells (in this case, the salmon's egg shell) and acts as a marker for the exfoliant. The exfoliant then dissolves the dead skin marked by the protein. Once the marked dead skin cells of the egg shell are dissolved, the exfoliant turns itself off without injuring the newborn salmon, which can then swim away unharmed.

17.    Realizing that exposure to this enzyme is what made the hatchery workers' skin look so much younger, Ms. Pao immediately saw the potential for translating the enzyme's unique properties to skincare products. A skincare product based on this enzyme would selectively exfoliate only dead skin cells while allowing live cells to flourish. In doing so, it would provide the same benefits as other leading anti-aging products, but without the harsh side effects that many of those products cause.

18.    Ms. Pao learned that ABT, a Norwegian company, was marketing the enzyme found in the salmon hatching water under the name of "Aquabeautine XL." Ms. Pao began working on formulating a line of skincare products based on this enzyme. By 2011, after extensive work, Restorsea created two products—Rejuvenating Day Cream and Revitalizing Eye

Cream.  Ms. Pao then founded Restorsea in 2012 to develop and sell a full line of skincare products that contain Aquabeautine XL.

19.     The cosmetics industry is highly competitive and increasingly overcrowded.  As a result, launching a new product—let alone a brand-new new product line—is extremely challenging.  Yet Restorsea's skincare products have been well received by the market since their introduction in October 2012.  Today, Restorsea's skincare line has grown to eight different products—including skin creams, cleansers, eye creams, and more—and Restorsea has plans to expand and diversify its product line in the coming years.

### B.     Restorsea and ABT Enter Into an Exclusivity Agreement for Aquabeautine XL and Similar Products ABT May Produce

20.     Because the formulas developed for Restorsea's products include the enzymes in Aquabeautine XL, Restorsea sought to secure from ABT the exclusive rights to the enzyme's supply and distribution.  Following extensive negotiations, Restorsea and ABT entered into the September 8, 2012 Amended and Restated Exclusivity Agreement ("Exclusivity Agreement" or "Agreement"), under which ABT granted Restorsea exclusive global rights to the enzyme.[1]

21.     Importantly, the Exclusivity Agreement covers not only Aquabeautine XL, but also certain other similar products that ABT may develop.  Thus, the "Product" covered by the Exclusivity Agreement includes Aquabeautine XL, as well as a broad class of compounds that contain detectible amounts of certain ingredients found in Aquabeautine XL—specifically solutions that are derived from hatching fluid from any fish that contains at least five parts per

---

[1] The parties had previously entered into an Exclusivity Agreement on or around March 19, 2012 ("Original Exclusivity Agreement.")  The September 8, 2012 Amended and Restated Exclusivity Agreement superseded the Original Exclusivity Agreement in its entirety, however, and the September 8, 2012 Exclusivity Agreement is the operative agreement at issue in this case.

billion of each of a protease, a structural protein, and a polypeptide (such solutions containing

such ingredients, each a "Product").[2]

22.     A number of terms and conditions in the Agreement bear directly on the present

dispute.  First and foremost, with an exception not relevant here,[3] the Agreement plainly and

unequivocally prohibits ABT from supplying Aquabeautine XL or any other "Product" to anyone

other than Restorsea:

> [ . . . ] ABT represents, warrants and covenants that from the Effective Date and
> during the Exclusivity Period, ***ABT shall not supply or otherwise distribute***
> ***Product to any Person other than directly to Purchaser*** or Amway except as and
> to the extent expressly permitted under the immediately preceding
> sentence.  [ . . . ]

(Exclusivity Agreement § 2.2 (emphasis added).)

23.     In addition, the Agreement also grants Restorsea the exclusive right and license to

import, sell, market, and distribute "End Products"—that is, products that use Aquabeautine XL

or another "Product" as an ingredient:

> Subject to Sections 2.1 and 2.6, ***ABT hereby grants to Purchaser***, during the
> Exclusivity Period, ***the exclusive right, and license under the ABT Intellectual***
> ***Property, to import, sell, market and distribute End Products*** within and into the
> Exclusive Targets in the Exclusive Territory.  [ . . . ]

(*Id.* (emphasis added).)

24.     By entering into the Agreement, ABT expressly promised to stop supplying

Aquabeautine XL and similar products to anyone other than Restorsea or Amway, representing

that "***ABT shall stop all supply*** of Product to any Person other than Purchaser or Amway as of

---

[2] For ease of reference, throughout the Complaint, Restorsea may occasionally refer to "Product" simply as
Aquabeautine XL.  All such references should be understood to mean "Aquabeautine XL, or any other product that
meets the definition of 'Product' under the Exclusivity Agreement."

[3] Although the Agreement also permits ABT to supply "Product" to Amway Corp., based on information currently
available to Restorsea, those sales do not implicate Restorsea's current breach of contract claims against ABT.
Consequently, ABT's sales to Amway Corp. are not addressed in further detail here.

the Effective Date" of the Agreement—that is, September 8, 2012.  (*Id.* § 2.6 (emphasis added); *id.* at 1 (defining September 8, 2012 as "Effective Date").)

25.     Finally, in addition to agreeing to undertake these obligations itself, ABT also promised that it would cause its manufacturers and agents to agree to comply with the Agreement, and that it would also terminate or amend its existing agreements with other parties so that they would not conflict with the Agreement:

> [ . . . ]  ABT shall cause its third party manufacturers and agents to agree in writing to comply with the terms of this Agreement and to name Purchaser as a third party beneficiary of its agreements with its third party manufacturers and agents.  ABT shall within thirty (30) days use commercially reasonable efforts to cause its third party manufacturers and agents to comply with the terms of this Agreement.

(*Id.* § 2.2.)

> ABT shall either terminate all Discontinued Agreements or amend them so that they do not conflict with this Agreement as promptly as is reasonably possible after the Effective Date but in any event not later than one-hundred and eighty (180) days following the Effective Date.  [ . . . ]

(*Id.* § 2.6.)

26.     These and other provisions reflect Restorsea's careful efforts to ensure that the fundamental and essential goals of the Agreement were met:  ABT and its manufacturers and agents would supply "Product" (*i.e.*, Aquabeautine XL and other similar products) only to Restorsea; and Restorsea would have the exclusive right to market and distribute goods containing "Product" as an ingredient.

27.     Needless to say, these exclusivity provisions are essential to the Exclusivity Agreement.  But for them, Restorsea would not have entered into the Agreement with ABT.

### C.     Restorsea Pays ABT Millions of Dollars for Exclusivity

28.     ABT is well compensated under the Exclusivity Agreement in the form of both scheduled payments and royalties.  Restorsea has fully complied with all of its payment

obligations under the Exclusivity Agreement, making payments to ABT of more than $5.9 million to date under that Agreement.

29.     ABT itself has recognized that the Agreement (not to mention Restorsea's payments under it) has been a boon to ABT.  For example, in February 2013, ABT announced that 2012—the year it had signed the Exclusivity Agreement—was the company's "[f]irst profitable year."  (ABT Q4 2012 Report at 2)[4]  In the "2012 Highlights" section, ABT also touted the "[c]ommercial breakthrough for Aquabeautine XL," as well as its "[a]greements with two US customers" (one of whom was Restorsea).  (Id. at 2.)  The "2012 Highlights" slide is reproduced below as Figure 1.



Figure 1

30.     In that same presentation, ABT also specifically highlighted its Exclusivity Agreement with Restorsea in a slide titled "Breakthrough for Aquabeautine XL," reporting that "Restorsea [was] granted exclusivity for certain market and channels."  (Id. at 6.)  ABT also recognized additional "[u]pside potential" from its agreement with Restorsea, like "sales income of Aquabeautine XL volume and additional royalty."  (See id.)

---

[4]        Available        at        http://www.aquabiotechnology.com/fileadmin/templates/files/Q4-2012/ABT_Q4_2012_presentation.pdf.

31.     Moreover, ABT plainly has recognized the benefit of attaching itself to a growing and successful company like Restorsea.  ABT reported that "Restorsea's new product line [was] launched at Fifth Avenue's Bergdorf Goodman department store and on the Internet" (*id.*) and, in describing Aquabeautine's "commercial breakthrough," noted that "ABT based products [were] launched on Fifth Avenue, the Internet and TV."   (*Id.* at 2.)   ABT's "Breakthrough for Aquabeautine XL" slide is reproduced below as Figure 2.



**Figure 2**

32.     By entering into its relationship with Restorsea, ABT thus has not only received millions of dollars in payments under the Exclusivity Agreement, but has benefited further by turning an annual profit for the first time in its history, and by seeing Aquabeautine XL "breakthrough" to commercial success and become a part of Restorsea's widely-popular product line launched in an upscale store and sold over the Internet.

33.     In other words, ABT has undeniably received the benefit of its bargain with Restorsea under the Exclusivity Agreement, and then some.  The same cannot be said for Restorsea, however.

**D.     After Paying Millions of Dollars to ABT, Restorsea Learns that ABT Is Violating the Exclusivity Agreement by Marketing Two Other Products with the Same Active Ingredients as Aquabeautine XL**

34.     Under the terms of the Exclusivity Agreement, ABT is restricted from selling to anyone other than Restorsea (and Amway) products that have more than five parts per billion of certain active ingredients (including leukolectin and zonase).  Put otherwise, any product that exceeds this threshold level of active ingredients comes within the ambit of the exclusivity rights enjoyed by Restorsea and cannot be lawfully sold by ABT to any third party (other than Amway in limited channels).

35.     Notwithstanding this express contractual obligation, ABT actively markets and sells to third parties two other products—which it calls "Beauty Propelline" and "Dermaclarine"—that, like Aquabeautine XL, are derived from the hatching water of Norwegian salmon.  On its website, ABT describes both Beauty Propelline and Dermaclarine as "part of ABT's patented skin care actives extracted from Norwegian fresh water after salmons have hatched."  (Beauty Propelline Brochure at 2[5]; Dermaclarine Brochure at 2[6].)  ABT describes Beauty Propelline as "a glycoprotein isolated from . . . various unique proteins released in the water where salmon eggs hatch" (Beauty Propelline Brochure at 2), and describes Dermaclarine as "a concentrated fraction" of the enzymes and proteins in that water.  (Dermaclarine Brochure at 2.)

---

[5]     *Available      at*      http://www.aquabiotechnology.com/fileadmin/templates/files/brochures/ ABT_Beauty_Propelline_brochure.pdf.

[6]     *Available      at*      http://www.aquabiotechnology.com/fileadmin/templates/files/brochures/ ABT_Dermaclarine_brochure.pdf.

36.     Restorsea recently learned that ABT's sale of its so-called Dermaclarine product and, upon information and belief, its so-called Beauty Propelline product violates the Exclusivity Agreement because those products—regardless of the names given to them by ABT—in fact contain sufficient levels of the active ingredients found in Aquabeautine XL to bring them within the ambit of the Exclusivity Agreement.

37.     Naturally, having spent a great deal of money in securing the exclusivity rights to Aquabeautine XL and its key ingredients, Restorsea wanted to ensure that ABT was complying with the Exclusivity Agreement.

38.     To that end, Restorsea acquired Dermaclarine on the open market directly from an ABT agent.  Restorsea then commissioned an independent laboratory, originally recommended by ABT, to test that Dermaclarine against Aquabeautine XL.  In carrying out the testing, the laboratory compared, among other things, the amount of leukolectin (one of Aquabeautine XL's active ingredients) in both products.

39.     The test results confirmed Restorsea's concerns.  The laboratory reported that the samples of Dermaclarine contained substantial amounts of leukolectin.  In fact, the amount of leukolectin in Dermaclarine *exceeded* the amount of leukolectin in Aquabeautine XL.

40.     As such, Dermaclarine is a "Product" and/or an "End Product" that is covered by and is subject to Restorsea's exclusive rights under the Exclusivity Agreement.  ABT's sales of Dermaclarine to third parties, in turn, violate ABT's obligations not to supply "Products" to entities other than Restorsea.  Those sales also violate Restorsea's exclusive right to import, sell, market, and distribute "End Products."

41.     By way of just one example, Restorsea has reason to believe that ABT is selling Dermaclarine to one of Restorsea's competitors—a company in the cosmetics industry with an

established distribution network in the United States—who then uses Dermaclarine to manufacture and sell skincare products that compete with Restorsea's products based on Aquabeautine XL. Because Dermaclarine is a "Product" and/or an "End Product" subject to Restorsea's exclusivity rights, these sales violate ABT's obligations under the Exclusivity Agreement, and have caused and are causing significant and ongoing harm to Restorsea.

42.     Moreover, based on information provided by ABT itself about the fractionation process it uses to make Beauty Propelline, Restorsea has reason to believe that Beauty Propelline also contains excessive quantities of leukolectin as well as zonase (another active ingredient in Aquabeautine XL). Thus, on information and belief, Beauty Propelline is also a "Product" and/or an "End Product" under the Agreement. On information and belief, therefore, ABT's sales of Beauty Propelline violate ABT's obligations not to supply "Products" to entities other than Restorsea, as well as Restorsea's exclusive right to import, sell, market, and distribute "End Products."

**E.    ABT's Breaches of the Exclusivity Agreement Have Caused Restorsea Significant and Ongoing Damages**

43.     ABT's sale of Dermaclarine and Beauty Propelline—products Restorsea believes have the same high levels of active ingredients as Aquabeautine XL—destroys Restorsea's exclusivity rights and renders worthless the Exclusivity Agreement for which Restorsea has already paid millions and, in order to maintain its exclusivity rights, would have to pay millions more.

44.     Restorsea entered into the Agreement on the express understanding that ABT would not supply other entities with products that contain detectable levels of leukolectin, zonase, and other active ingredients found in Aquabeautine XL. As the name of the Exclusivity

Agreement obviously indicates, the point was to ensure that ABT's supply of Aquabeautine XL and other "Products" would be just that—*exclusive to Restorsea*.

45.     But despite promising not to supply other entities with Aquabeautine XL or similar products (and pocketing nearly $6 million from Restorsea so far in exchange for that promise), ABT has been selling at least two other compounds that, on information and belief, are a "Product" and/or an "End Product" within the scope of the Exclusivity Agreement.  As a result, ABT has been and continues to be in breach of the Exclusivity Agreement.

46.     Had Restorsea known that ABT would not honor the Exclusivity Agreement, Restorsea would not have entered into the Agreement or made the payments thereunder to ABT. As a direct result of ABT's breaches, therefore, Restorsea has suffered monetary damages in an amount to be proven at trial, but believed to exceed the $5.9 million paid to ABT for its empty promise of exclusivity.

**F.     Restorsea Has No Adequate Remedy at Law for Certain of ABT's Breaches**

47.     Having the exclusive rights to Aquabeautine XL and other similar products gives Restorsea a competitive advantage and, thus, is of unique and extraordinary value both to Restorsea's current business and to its future expansion and growth.  As such, no amount of money damages can adequately compensate Restorsea for all of the harm caused by ABT's breaches of the Exclusivity Agreement.

48.     Aquabeautine XL is an important ingredient in Restorsea's entire line of products—one which is necessary to developing the formulas for those products.  So, Restorsea ensured that it would be the only company that can develop and sell skincare products based on Aquabeautine XL and other similar compounds provided by ABT, thereby obtaining a significant advantage over potential competitors.

49.     ABT's failure to honor the Exclusivity Agreement causes irreparable harm to Restorsea's goodwill, its plans, its relationships with customers and investors, and its future business prospects.  ABT's ongoing sale of these compounds to other companies destroys Restorsea's competitive advantage, threatens Restorsea's entire product line, dims Restorsea's prospects for future growth and development, and has the potential to undo all of Restorsea's hard-earned success.  These injuries cannot be remedied by money damages.

50.     Restorsea has fully performed its obligations under the Exclusivity Agreement, including having paid ABT millions of dollars in exchange for its exclusive rights, and is willing and able to perform its remaining obligations.

51.     ABT is able to perform its obligations under the Exclusivity Agreement, including by ceasing to market and/or sell Dermaclarine, Beauty Propelline, and any other product falling within the scope of the Exclusivity Agreement to any and all third parties.

52.     So, in addition to monetary damages, Restorsea is entitled to specific performance of ABT's obligations under the Exclusivity Agreement because, as detailed above, Restorsea has no adequate remedy at law to fully compensate it for ABT's breaches of the Exclusivity Agreement.

**CLAIMS FOR RELIEF**

**COUNT I**
**Breach of Contract**

53.     Restorsea repeats and alleges each and every allegation above as if fully set forth herein.

54.     Restorsea and ABT are parties to the Exclusivity Agreement, which is a valid, binding, and enforceable contract.

55.     Restorsea has complied with and performed all of its obligations under the Exclusivity Agreement, and is willing and able to perform its remaining obligations.

56.     ABT has breached and is continuing to breach the Exclusivity Agreement by, among other things:   (a) offering for sale, selling, supplying, or otherwise distributing Dermaclarine and Beauty Propelline in violation of its obligation not to supply "Product" to entities other than Restorsea; and  (b) offering for sale, selling, supplying, or otherwise distributing Dermaclarine and Beauty Propelline as "End Products" in violation of Restorsea's exclusive right and license to import, sell, market and distribute "End Products."

57.     ABT is able to perform its obligations under the Exclusivity Agreement, including by ceasing to sell Dermaclarine, Beauty Propelline, and any other product falling within the scope of the Exclusivity Agreement to any and all third parties.

58.     As a result of ABT's past and ongoing breaches of the Exclusivity Agreement, Restorsea has suffered and continues to suffer significant monetary damages in an amount to be established at trial, including the $5.9 million Restorsea has already paid to ABT under the Exclusivity Agreement.

59.     In addition, as a result of ABT's breaches of the Exclusivity Agreement, Restorsea has suffered and will continue to suffer irreparable harm to its business, reputation, and goodwill, for which monetary damages are not adequate.

## PRAYER FOR RELIEF

WHEREFORE, Restorsea respectfully requests judgment against ABT as follows:

1.    Compensatory damages suffered by Restorsea as a result of ABT's breaches of the Exclusivity Agreement in an amount to be determined at trial but believed to exceed $5.9 million, together with pre- and post-judgment interest;

2.    Compelling ABT to specifically perform its obligations under the Exclusivity Agreement including, but not limited to, its obligations to refrain from selling Dermaclarine, Beauty Propelline, and any other compound falling within the scope of the Exclusivity Agreement to others now and in the future, and enjoining ABT from further violations of the Exclusivity Agreement; and

3.    Costs and such other and further relief as this Court deems just and proper.

## JURY DEMAND

Restorsea demands a trial by jury on all issues so triable in this action.

Dated: February 7, 2014
New York, New York

Respectfully submitted,

Joseph Serino, Jr., P.C.
David S. Flugman
Dmitriy G. Tishyevich (*pro hac vice*
    application to be filed)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
joseph.serino@kirkland.com
david.flugman@kirkland.com
dmitriy.tishyevich@kirkland.com

*Attorneys for Plaintiff Restorsea, LLC*